## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| HERBERT ALLEN ANDREW, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:10CV90 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The instant matter comes before the undersigned Magistrate Judge for a recommended ruling on Plaintiffs' Motion for Summary Judgment (Docket Entry 33) and a ruling on the United States' Motion for Leave to File a Suggestion of Subsequently Decided Authority (Docket Entry 39). (See Docket Entry dated Jan. 25, 2013; see also Docket Entry dated Oct. 31, 2011 (assigning case to undersigned Magistrate Judge).) For the reasons that follow, Plaintiffs' instant Motion should be denied and the United States' instant Motion will be denied as moot.

## I. Factual Background

Plaintiffs "are former shareholders or successors in interest to former shareholders of GNC Investors Club, Inc, a North Carolina corporation ('GNC')." (Docket Entry 1, ¶ 22; see also Docket Entry 34-2, ¶ 3.) GNC's sole activities were "(a) acquiring[,] holding and selling securities and holding cash and cash equivalents; and (b) conducting meetings, educating its members with regard to the

stock market, and carrying on other corporate activities of its directors and shareholders." (Docket Entry 34-2, ¶ 2.) In 2000, "GNC's assets consisted solely of ownership of publicly traded stock and nominal amounts of cash." (Id., ¶ 6.) That year, the shareholders of GNC "began to consider alternative strategies for GNC, including liquidation." (Id., ¶ 8.)

In October of 2000, Thomas Watkins (a member of a similar investment group through which he had learned of a company, MidCoast Credit Corporation ("MidCoast"), interested in acquiring corporations like GNC) approached the GNC shareholders about selling their GNC stock instead of liquidating. (Id., ¶ 10; see also Docket Entry 34-5 at 4-5.)[1] Via a Letter of Intent and Share Agreement, MidCoast proposed that "it or its designee would acquire the GNC shareholders' stock as an alternative to the liquidation of GNC" (Docket Entry 34-2, ¶ 11) and provided a schedule "demonstrating that the proceeds to the shareholders from a stock sale would be greater if the GNC shareholders sold their shares to MidCoast or its designee instead of GNC liquidating the company and distributing the remaining cash after payment of corporate income tax to its shareholders" (id., ¶ 12; see also Docket Entry 36-14). "MidCoast represented that the GNC shareholders would collectively

_____

[1] All pin citations (other than to paragraph numbers) refer to the pagination in the footer appended to each document by the CM/ECF system.

receive $391,887 more in proceeds from a stock sale than if they were to liquidate GNC." (Docket Entry 34-2, ¶ 12.)

In early November of 2000, GNC liquidated its publicly traded stock for $4,955,000. (Id., ¶ 13.) As a result of this sale, "GNC had an estimated federal tax liability of $1,208,690 (of which $30,000 had been paid [as of November 22, 2000]) . . . ." (Id., ¶ 15.) "MidCoast arranged for Battery Street, Inc., a newly-formed Delaware corporation, to acquire the GNC stock." (Id., ¶ 14.) On November 28, 2000, the GNC shareholders sold their stock in GNC to Battery Street for $3,818,000. (Id., ¶ 16.) At this time, GNC's only assets consisted of $4,932,676 in cash (id., ¶ 18) and it had a federal tax liability of approximately $1,210,811, as well as a North Carolina state tax liability of approximately $267,790 (id., ¶ 19). As part of the purchase agreement, Battery Street agreed to pay GNC's outstanding tax liability. (Docket Entry 34-6 at 19.) On November 27, 2000, Battery Street took out a $3.8 million loan, subject to repayment within 24 hours. (Docket Entry 34-2, ¶ 17; see also id. at 10.)

"On December 28, 2004, the IRS issued a statutory Notice of Deficiency to GNC for the tax year ending April 30, 2001." (Id., ¶ 23.) "The deficiency was in the amount of $1,286,686 and an accuracy related penalty in the amount of $514,573.20." (Id.) The IRS and GNC entered into a stipulation on September 2, 2005, whereby they agreed that GNC had a deficiency of $1,158,132 and a

3

related penalty of $231,626. (<u>Id.</u>, ¶ 24.) The IRS "proposed assessments against [] [P]laintiffs as transferees of GNC" on September 20, 2008. (<u>Id.</u>, ¶ 25.) Plaintiffs paid the deficiency and related penalty in full. (<u>Id.</u>, ¶ 26.) They thereafter filed the instant Complaint against the United States "for the refund of taxes (assessable penalties) erroneously and illegally assessed against and collected from Plaintiffs." (Docket Entry 1, ¶ 17.)

## II. Procedural Background

During the pendency of this case, the United States sought (Docket Entry 20) and this Court granted a stay pending resolution by the Fourth Circuit of a case raising similar issues (Docket Entry 22). The Fourth Circuit, thereafter, issued its opinion in that case (<u>see</u> Docket Entry 23 at 2 (citing <u>Starnes v. Commissioner of Internal Revenue</u>, 680 F.3d 417 (4th Cir. 2012))), and this Court granted a further stay pending a ruling on a petition for rehearing en banc by the United States (<u>see</u> Docket Entry 25). The Parties subsequently submitted a Joint Notice indicating that the Fourth Circuit had denied that petition and that the Parties had not settled the instant matter. (Docket Entry 27 at 2.) Plaintiffs then filed the instant Motion for Summary Judgment (Docket Entry 33), to which the United States responded (Docket Entry 36) and Plaintiffs replied (Docket Entry 37). The United States subsequently filed its first Motion for Leave to File a Suggestion of Subsequent Authority (Docket Entry 38), which the Court granted

4

(see Docket Entry dated Apr. 27, 2013), followed by the instant Motion for Leave to File a Suggestion of Subsequent Authority (Docket Entry 39).

### III. Motion for Summary Judgment

#### A. Summary Judgment Standard

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a genuine dispute exists if the evidence presented could lead a reasonable factfinder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In making this determination, the Court must view the evidence and any reasonable inferences therefrom in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); but see Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law."). "[N]or is [summary judgment] appropriate 'even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom.'" Gordon v. Kidd, 971 F.2d 1087, 1093 (4th Cir. 1992) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). Furthermore, "[w]here states of mind are

5

decisive as elements of a claim or defense, summary judgment ordinarily will not lie." Id. at 1094.

## B. Starnes v. Commissioner of Internal Revenue

In the case that led to the stay of this action, the Fourth Circuit affirmed the finding of the United States Tax Court in favor of individuals challenging their assessed federal income tax liability as transferees for a corporation's unpaid taxes. Starnes, 680 F.3d at 420. The plaintiffs in that case were former shareholders of Tarcon, a freight consolidation company. Id. The former shareholders, upon deciding to retire, considered various options for disposing of the company in the spring of 2003. Id. at 420-21. They sold Tarcon's only remaining non-cash asset (a warehouse) and entered into an agreement with MidCoast whereby MidCoast would buy all of the stock in Tarcon. Id. at 421. MidCoast's offer was contingent upon the conversion of Tarcon's assets to cash and MidCoast was aware, during the negotiations with Tarcon, that Tarcon was arranging for the sale of its warehouse; "[t]hus it was understood . . . that when MidCoast purchased the stock, Tarcon's only asset would be cash." Id.

MidCoast agreed to pay Tarcon's 2003 tax liability and "[e]very witness who knew the details of the stock sale, including the attorney for MidCoast, testified that they had no reason to believe MidCoast would not honor th[at] commitment." Id. at 421-22. In its offer letter, MidCoast explained that it pursued

6

acquisitions of companies such as Tarcon "as an effective way to grow [its] parent company's core asset recovery operations." Id. at 421. Tarcon's former shareholders testified that "they did not understand what was meant by the 'asset recovery business' or what MidCoast planned to do with Tarcon, but they made no inquiries." Id. at 422.

On October 30, 2003, Tarcon sold its warehouse for $3.18 million. Id. at 423. That sale resulted in a corporate income tax liability of $880,000, giving Tarcon a net worth of approximately $2.2 million. Id. MidCoast agreed to buy all of Tarcon's stock "for an amount equal to Tarcon's cash less 56.25 percent of Tarcon's local, state, and federal corporate income taxes for 2003," or approximately $2.6 million. Id. The sale closed on November 13, 2003. Id.

After executing the agreement, the former shareholders transferred the $3.1 million in cash assets to their attorneys' escrow account, and MidCoast transferred the $2.6 million to a similar account held by its attorneys. Id. at 424. The former shareholders' attorneys transferred the asset money to MidCoast's attorneys' account, and from that account the former shareholders individually received their portion of the sale price. Id. The $3.1 million was transferred into Tarcon's "post-closing" bank account on November 14, 2003. Id.

7

"[O]n November 24, 2003, eleven days after the November 13 closing, MidCoast sold its Tarcon stock to Sequoia Capital, L.L.C., a Bermuda company, for $2,861,465.96." Id. Two days later, the funds in Tarcon's post-closing account were transferred into a Deutsche Bank account under Tarcon's name. Id. "[O]n December 1, 2003, $2,960,000 was transferred from the Deutsche Bank account to an account in the Cook Islands in the name of 'Delta Trading Partners,' and $126,822 was transferred to a MidCoast bank account. After December 1, 2003, Tarcon never had more than $132,320 in any account." Id.

Tarcon filed its 2003 tax return, reporting capital gains and ordinary income offset by two large losses, purportedly from December 2003. Id. "Thus, the return reported an overall loss and no tax due." Id. Upon review, the IRS "disallowed the claimed deductions" for the two losses, id. at 424-25, and determined "Tarcon owed an income tax deficiency for 2003 of $855,237," id. at 425. When the IRS was unable to recover the liability from Tarcon, it sent notices of transferee liability to the Plaintiffs. Id. The notices indicated the amount due from each Plaintiff and explained that the combined sale of the warehouse and the stock sale was "substantially similar to an Intermediary transaction shelter described in Notice 2001-16, 2001-1 C.B. 730, or, alternatively, the transaction [was] in substance a sale of Tarcon assets [] followed by a redemption of Tarcon stock owed by the

Tarcon shareholders." Id. (internal quotation marks omitted). The former shareholders contested the notices before the United States Tax Court. Id. The Tax Court found in favor of the former shareholders after a bench trial, id. at 428, and the Fourth Circuit affirmed its holding, id. at 440.

The Fourth Circuit upheld the Tax Court's use of North Carolina law to determine whether a basis existed for holding the former shareholders liable for the transferor's debts. Id. at 430; see also id. at 427 ("As the tax court in this case properly articulated, § 6901 provides a procedure through which the IRS may collect unpaid taxes owed by the transferor of the assets from a transferee if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debt." (internal quotation marks omitted)). Under North Carolina law, "a 'transfer' made by a debtor 'is fraudulent as to a creditor whose claim arose before the transfer was made,' if the debtor (1) made the transfer 'without receiving a reasonably equivalent value in exchange,' and (2) 'was insolvent at that time' or 'became insolvent as a result of the transfer.'" Id. at 430 (quoting N.C. Gen. Stat. § 39-23.5). In the case of the Tarcon sale, the Fourth Circuit (and the Tax Court) identified the central question as involving the determination of what transfer or combination of transfers counted in assessing "whether Tarcon received reasonably equivalent value and/or was rendered

9

insolvent," id. at 432; the Fourth Circuit further explained that the options consisted of the November 13-14, 2003 transfers (of $3.1 million from the former shareholders to MidCoast and $2.6 million from MidCoast to the former shareholders) or those transactions as well as the December 1, 2003 transfer of Tarcon's cash to the Cook Island account, id. In the former, Tarcon received reasonably equivalent value and remained solvent; in the latter, it did not. Id. at 432-33.

In selecting the proper time frame, the Tax Court looked to North Carolina law concerning when multiple transactions qualify as "collapsed." Id. at 433. It determined that such a collapse occurs only if the former shareholders "had actual or constructive knowledge of the entire scheme . . . ." Id. (internal quotation marks omitted). The Fourth Circuit affirmed this basic conclusion and analyzed the standard in greater detail, indicating that the former shareholders would have liability if the Commissioner had proven they "knew or should have known before the deal closed that MidCoast would cause Tarcon to fail to pay its 2003 taxes." Id. Under North Carolina law, the Fourth Circuit explained, the latter constructive knowledge consists of two prongs:

> [1] did the [f]ormer [s]hareholders have actual knowledge of facts that would have led a reasonable person concerned about Tarcon's solvency to inquire further into MidCoast's post-closing plans[; and 2] if the [f]ormer [s]hareholders were thereby on "inquiry notice," whether the inquiry a reasonably diligent, similarly-situated person would have

10

> undertaken revealed MidCoast's plan to leave
> Tarcon unable to pay its 2003 taxes?

Id. at 434 (citing Vail v. Vail, 233 N.C. 109, 116, 63 S.E.2d 202, 207 (1951), and Nash v. Motorola Commc'ns & Elecs., Inc., 96 N.C. App. 329, 331-32, 385 S.E.2d 537, 538 (1989)). Finding that the Tax Court applied this standard, the Fourth Circuit upheld the determination that the Commissioner failed to prove that the former shareholders knew, actually or constructively, that MidCoast would cause Tarcon to fail to pay its 2003 taxes. Id. In analyzing the Tax Court's findings, the Fourth Circuit acknowledged evidence in favor of a finding of constructive knowledge, but noted that it "do[es] not persuade us that the Tax Court was clearly erroneous in finding that, under the circumstances shown by the evidence, the [f]ormer [s]hareholders lacked constructive knowledge that Tarcon was unlikely to pay its 2003 taxes." Id. at 435.

Thus, the Fourth Circuit upheld the Tax Court's conclusion that "the Commissioner failed to prove that the December 1[, 2003] transfer – which rendered Tarcon essentially insolvent and unable to satisfy its 2003 tax liability – should be collapsed with the earlier transfers for purposes of determining whether Tarcon received 'reasonably equivalent value' in the 'transfer,' as required by N.C. Gen. Stat. § 39-23.5." Id. at 437. As a result, the former shareholders did not have liability under Section 39-23.5. Id.

11

For similar reasons, the Fourth Circuit also upheld the Tax Court's finding that the transfer did not qualify as fraudulent pursuant to two other state law provisions, <u>id.</u> at 437-38, which deem a transfer as fraudulent

> if the debtor made the transfer or incurred the obligation:
>
> (1) With intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.C. Gen. Stat. § 39-23.4(a). In upholding the Tax Court's rejection of liability under those provisions, the Fourth Circuit found dispositive the Tax Court's adverse factual determinations that foreclosed collapsing the November 13-14 and December 1 transfers, as explained in the discussion of liability under N.C. Gen Stat. § 39-23.5. <u>Starnes</u>, 680 F.3d at 437-38.

### *C.  GNC Sale*

For the purposes of summary judgment, Plaintiffs in this case "concede that this Court may assume that Plaintiffs are transferees pursuant to § 6901." (Docket Entry 34 at 14.) Moreover,

Plaintiffs apparently do not contest that, should the Court determine that the sale of GNC and Battery Street's repayment of its $3.8 million loan "collapse," Plaintiffs would not have received "reasonably equivalent value" and/or GNC would have become insolvent under North Carolina law. (Docket Entry 34 at 6-20.) The only remaining question for liability under N.C. Gen. Stat. § 39-23.5 thus concerns whether Plaintiffs knew or should have known of the likelihood that Battery Street would cause GNC to fail to pay its 2000 taxes. (Id.; see also Docket Entry 36 at 9-16.)

Plaintiffs argue that they did not have actual or constructive knowledge before the deal closed that Battery Street would cause GNC to fail to pay its 2000 taxes and, therefore, that the Court should consider only the transfer of $3.8 million from Battery Street to Plaintiffs in exchange for GNC's $4.9 million in cash assets. (Docket Entry 34 at 15-20.) Plaintiffs further contend that the facts of the instant case parallel those in Starnes (id. at 16-18) and, in fact, even more compellingly support Plaintiffs' position (id. at 18-20). The United States, on the other hand, distinguishes Starnes in a number of respects (Docket Entry 36 at 9) and asserts that, for summary judgment purposes, sufficient evidence shows that Plaintiffs should have discovered that GNC would not pay its 2000 taxes (id. at 10-16).

As an initial matter, the procedural posture of the instant case significantly differs from that of Starnes. As the United

13

States has pointed out (see id. at 8), the Fourth Circuit considered Starnes only after a bench trial before the Tax Court. The Fourth Circuit affirmed that the Tax Court employed the correct legal standard and that its factual findings survived clear error review.  See Starnes, 680 F.3d at 425, 435, 437.  At the summary judgment stage, however, the United States only needs to show that a dispute as to a material fact exists and this Court must draw any inferences in favor of the United States, see Matsushita, 475 U.S. at 587.

### 1.  Inquiry Notice

The first question in the constructive knowledge analysis concerns whether or not Plaintiffs had actual knowledge of facts that would lead a reasonable person to inquire further into Battery Street's post-closing plans.  Starnes, 680 F.3d at 434.  Plaintiffs contend that they investigated MidCoast and found that it was legitimate; "[t]herefore, Plaintiff's made a reasonable inquiry in an attempt to ascertain the truth and should not be subjected to the second prong of the constructive knowledge test under North Carolina law."  (Docket Entry 34 at 16.)

The United States points to a number of facts in support of its argument that Plaintiffs in fact had notice of facts that should have led them to inquire further.  First, the transfers in this case that resulted in GNC becoming insolvent took place over a period of only two days, as compared with 16 days in Starnes.

14

(Docket Entry 36 at 12-13.) The United States argues that "Plaintiffs were participants for at least this two day period, and the actions which occurred over those two days were enough to put Plaintiffs on notice that they needed to inquire further." (Id. at 13.) The United States also points to the fact that Battery Street "agreed to pay [] Plaintiffs $3.8 million for the stock of a corporation which was only worth $3.4 million, and whose sole asset was cash . . . ." (Id.) According to the United States, "[t]here was no legitimate business reason for Battery Street to pay a premium to GNC for cash, let alone a $400,000 premium. The so-called premium made business sense only if the parties understood that GNC's $1.5 million tax liability would not be paid. The premium represented Plaintiffs' cut of the taxes not paid to the United States." (Id. at 14.) Furthermore, "Plaintiffs claim they did not know to whom they were selling their stock, and took no steps to find out." (Id. (citing Docket Entry 36-5 at 6, 7).)

Drawing all reasonable inferences in favor of the United States, see Matsushita, 475 U.S. at 587, a material dispute exists as to whether Plaintiffs had actual knowledge of facts that would have led a reasonable person to inquire further, see Starnes, 680 F.3d at 434. Consistent with the Tax Court's reasoning in Starnes, a reasonable fact finder could determine that Plaintiffs, knowing that the proposal would allow them to sell their corporation for more than its worth, should have inquired further about the

15

acquiring company. See <u>Starnes v. C.I.R.</u>, T.C. Memo. 2011-63, 2011 WL 894608, at *10 (U.S. Tax Ct. 2011) ("Further inquiry by the Tarcon shareholders, who were also officers and directors of Tarcon, was likely warranted considering that they ultimately received proceeds from the sale of their Tarcon stock that exceeded the Tarcon cash on hand, less the calculated tax liabilities as of October 31, 2003. The Tarcon shareholders failed to do so."), <u>aff'd</u>, 680 F.3d at 434 ("The [Tax C]ourt found the Commissioner satisfied his burden on prong one because it found that although the circumstances *did* oblige the Former Shareholders to conduct '[f]urther inquiry,' they 'failed to do so.'" (some alterations in original)).

### 2. Findings of Reasonable Inquiry

The United States contends that "[a] reasonably diligent inquiry would have revealed that when Battery Street acquired GNC, it had no assets other than the shares of GNC, which itself held only cash from the pre-closing mandated sale of GNC's assets and a large tax liability from the same pre-closing mandated sale of GNC's assets." (Docket Entry 36 at 14.) Furthermore, the United States points out that Plaintiffs made no inquiry into Battery Street at all. (<u>Id.</u> at 14-15 & n.7 (citing Docket Entry 34 at 16).) Had they investigated Battery Street, the United States alleges Plaintiffs would have discovered the following facts:

16

(1) Battery Street incorporated only two months before the scheduled closing (id. at 15 (citing Docket Entry 36-11));

(2) Battery Street borrowed approximately $3.8 million to buy Plaintiffs' GNC stock (id. (citing Docket Entry 36-1 at 9));

(3) Battery Street had to repay said loan within 24 hours (id. (citing Docket Entry 36-1 at 9)); and

(4) in a letter dated the day of the purchase agreement, Battery Street's special counsel "disclaimed any opinion as to the 'truth, accuracy and completeness of any of the representations, warranties or statements as to factual matters given by Battery Street or required of Battery Street under the Agreement'" (id. (quoting Docket Entry 36-12 at 3)).

These facts materially differentiate this case from Starnes. Under these circumstances, particularly given the absence of evidence indicating that Battery Street had any assets prior to its acquisition of GNC, a reasonable fact finder could infer that a reasonably diligent individual in Plaintiffs' position would have discovered that Battery Street could only execute the purchase of GNC's stock after taking out a $3.8 million loan, subject to repayment the next day with the GNC cash Battery Street would acquire from the sale, thus leaving insufficient funds to repay GNC's tax liability. Further, to the extent that the United States relies on additional facts similar to the ones at issue in Starnes, the Fourth Circuit only ruled that such evidence "d[id] not

17

persuade [it] that the Tax Court was <u>clearly erroneous</u> in finding that, under the circumstances shown by the evidence, the Former Shareholders lacked constructive knowledge that Tarcon was unlikely to pay its 2003 taxes." <u>Starnes</u>, 680 F.3d at 435 (emphasis added). In other words, in <u>Starnes</u>, the Fourth Circuit reviewed the Tax Court's decision in favor of the plaintiffs only for clear error; in the instant case, the United States (as the non-moving party) receives the benefit of all reasonable inferences.

Plaintiffs also contend that the Court should disregard the arguments by the United States that an investigation into Battery Street would have revealed its recent incorporation, its borrowing of the money for the sale, and its obligation to repay said funds within 24 hours. (Docket Entry 37 at 9-10.) However, Plaintiffs justify this position by stating that "the acts of Battery Street after the closing transaction should not be collapsed into the closing transaction and are therefore irrelevant." (<u>Id.</u> at 10.) The loan and related immediate repayment obligation, however, came about on November 27, 2000, one day before the closing, making Plaintiffs' argument unavailing as to these particular facts. Moreover, Plaintiffs offer no argument as to why the Court should disregard the fact of Battery Street's recent incorporation, which clearly occurred prior to closing. (<u>Id.</u>)

In sum, in <u>Starnes</u>, the Fourth Circuit deferentially reviewed the Tax Court's findings of fact and verdict after a bench trial,

18

<u>Starnes</u>, 680 F.3d at 425, 428, whereas, in the instant case, still at the summary judgment stage, the United States receives the benefit of all reasonable inferences. This distinction makes a difference, given the record of this case. See <u>Runvee, Inc. v. United States</u>, No. 2:10-CV-2260-KJD-GWF, 2013 WL 1249602, at *13 (D. Nev. Mar. 26, 2013) (unpublished) (distinguishing summary judgment issue from <u>Starnes</u> "on the basis that [it was] established on facts developed at trial" and "decided after [a] factually intensive presentation[] of evidence"); <u>see also</u> <u>Starnes</u>, 680 F.3d at 440 n.14 (recognizing that each transferee liability case must turn on its particular facts and citing "primacy of the [trial court's] role as fact finder"). Viewing the record in a light most favorable to the United States, a reasonable fact finder could determine that a reasonable inquiry into Battery Street, prior to the sale, would have revealed facts indicating that, as a result of the sale, GNC would fail to pay its 2000 taxes. For this reason, the Court should deny Plaintiffs' instant Motion.[2]

### D.  Other Theories of Liability

Plaintiffs next argue that no genuine issue of fact exists as to whether the transfer(s) violated N.C. Gen. Stat. § 39-23.4(a)(1) & (2). (<u>See</u> Docket Entry 34 at 20-21; Docket Entry 37 at 11.) As

---

[2]     The subsequently decided authority proffered by the United States in its instant Motion (Docket Entry 39) does not significantly add to or alter the analysis of Plaintiffs' instant Motion. The Court therefore will deny the instant Motion of the United States as moot.

Plaintiffs acknowledge, these other potential theories of liability also turn on the question of whether the post-sale transfer(s) collapse into the sale (see id.) and the Court therefore should not grant summary judgment in favor of Plaintiffs on these issues for the reasons discussed in the prior subsection. See Starnes, 680 F.3d at 437-38 (recognizing that analysis under N.C. Gen. Stat. § 39-23.4(a)(1) & (2) rests largely on whether relevant transfers "collapse").

### IV. Conclusion

Plaintiffs have failed to show the lack of a genuine dispute as to any material fact.

**IT IS THEREFORE RECOMMENDED** that Plaintiffs' Motion for Summary Judgment (Docket Entry 33) be denied.

**IT IS ORDERED** that Plaintiff's Motion for Leave to File a Suggestion of Subsequently Decided Authority (Docket Entry 39) is **DENIED AS MOOT**.

　　　／s／ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 27, 2013