IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| HERBERT ALLEN ANDREW, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:10-CV-90 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The plaintiffs filed this lawsuit against the United States seeking a refund of taxes and penalties assessed against them as transferees of GNC Investors Club, Inc.  (*See* Doc. 1.)  The case came on for a bench trial on November 17, 2014.  Having considered the documentary evidence and testimony, the Court finds that the plaintiffs have proven that there is no basis under North Carolina law for holding them liable as transferees for GNC's unpaid taxes.

The parties stipulated to many of the facts, (*see* Doc. 36-1), and these stipulations are incorporated in the Court's findings by reference.  The Court's remaining findings are based either on undisputed evidence or on its evaluation of the admissible evidence and its determination about the credibility of and appropriate weight to be given to the testimony of the various witnesses and the various exhibits.  The plaintiffs' trial exhibits will be referenced as "PTX" and the defendant's trial exhibits as "DTX."  Because many

of the defendant's exhibits have multiple pages and documents, the Court has often used the number found on the bottom left of the page, i.e., DTX 15.0043, to specifically identify the location of the referenced evidence. The Court has not attempted to cite all of the evidence available to support its findings.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## BACKGROUND FACTS

GNC Investors Club, Inc., ("GNC") was incorporated as a "C" corporation in 1957 and engaged in the business of (1) acquiring, holding, and selling securities and holding cash and cash equivalents; and (2) conducting meetings and educating its members about the stock market. (Doc. 36-1 at ¶ 1, 2; Testimony of H.A. Andrew.) GNC's shareholders met monthly to conduct the corporation's business and for social purposes. (DTX 15.0036-15.0069.) In 2000, the plaintiffs or their predecessors in interest collectively owned 16 of the 24 outstanding GNC shares, and each share represented one vote. (Doc. 36-1 at ¶¶ 4, 5.)

In the spring of 2000, GNC began to consider alternative business models. (Doc. 36 at ¶ 7.) The shareholders' goal was to avoid the double taxation resulting from its C-corporation status and to reduce the buy-in price for new members. (DTX 15.0036-15.0037; Testimony of P. Thompson, H.A. Andrew; Doc. 97-2 at 16-17.) After considering and rejecting the possibility of converting to an LLC in March of 2000, (DTX 15.0001-15.0035, 15.0051; Testimony of W.K. Fraser), the shareholders began

considering dissolution in the late summer and early fall of 2000.  (Doc. 36-1 at ¶¶ 7-8; DTX 15.0042-15.0048.)

Michael Haley, then-president of GNC and an astute businessman, formed a Dissolution Task Force ("Dissolution Committee") composed of himself, Clayton Lee, W. Kenneth Fraser, and Porter Thompson.  (Doc. 36-1 at ¶ 9; *see also* Testimony of W.K. Fraser, P. Thompson, H.A. Andrew, J. Aplington.)  GNC invited Lewis Ritchie, a KPMG tax advisor, to several meetings to discuss the tax consequences of dissolution.  (DTX 15.0045-15.0047.)  In September 2000, the shareholders voted to pursue dissolution and reorganization as an LLC, and GNC hired local attorney Sharon Allen to assist.  (DTX 15.0051.)  The shareholders expected the dissolution and reorganization to be completed in December of 2000.  (DTX 15.0053.)  Each shareholder knew that if this was done, the corporation would have to pay taxes on the gains from the sale of GNC's stock and that each shareholder would have to pay taxes on the cash proceeds distributed to him after dissolution.  (DTX 15.0053; DTX 22.0075; Testimony of S. Allen.)

In October 2000, Mr. Lee saw Thomas Watkins, a reputable local attorney with over 30 years of experience in the purchase and sale of companies, at a social event.  (Doc. 36-1 at ¶ 10; *see also* Testimony of T. Watkins.)  During their conversation, the topic of investment clubs came up, and Mr. Watkins told Mr. Lee that he might know of an alternative to dissolution.  (Doc. 36-1 at ¶ 10; Testimony of T. Watkins.)  Mr. Watkins had received several solicitations from MidCoast Credit Corporation ("MidCoast") that communicated MidCoast's interest in acquiring the stock of C corporations and paying its shareholders a premium in excess of the amount they would otherwise receive from

liquidation.  (DTX 24.0667-24.0668.)  Mr. Watkins reached out to MidCoast, and

MidCoast expressed an interest to Mr. Watkins in purchasing an investment club's stock.

(Testimony of T. Watkins.)  Mr. Watkins then conveyed MidCoast's interest to Mr. Lee,

and Mr. Lee authorized Mr. Watkins to share GNC's information with MidCoast.

(Testimony of T. Watkins; DTX 16.0009.)  MidCoast retained Mr. Watkins to represent

it in negotiations with GNC.  (DTX 24.0693-24.0694; Testimony of T. Watkins.)

MidCoast sent a letter of intent to Mr. Watkins on October 17, 2000, stating terms

for a deal to buy 100% of GNC's stock.  (DTX 16.0009-16.0012; Testimony of T.

Watkins.)  MidCoast proposed that it or its designee would acquire the GNC

shareholders' stock as an alternative to the shareholders liquidating GNC.  (Doc. 36-1 at ¶

11; DTX 16.0009-16.0012.)  MidCoast required that GNC liquidate its stock portfolio

before the closing date.  (DTX 16.0009-16.0010.)  MidCoast provided a schedule

showing that the GNC shareholders would receive more money from selling GNC's stock

to MidCoast than from liquidation, taking into account the tax consequences.  (Doc. 36-1

at ¶ 12; DTX 16.0013; Testimony of T. Watkins.)  Specifically, MidCoast represented

that the shareholders would collectively receive $401,325 more in proceeds from the

stock sale to MidCoast than if they liquidated GNC; this constituted a premium of

approximately 10%.  (DTX 16.0013; Testimony of T. Watkins.)

The same day Mr. Watkins received the letter of intent from MidCoast, he met

with the Dissolution Committee members and communicated MidCoast's proposal to

them.  (Testimony of T. Watkins; *see also* DTX 16.0090.)  At a shareholder meeting that

night, the shareholders considered and accepted MidCoast's proposal.  (DTX 15.0054.)

4

After accepting MidCoast's proposal, the Dissolution Committee checked MidCoast's business references. (DTX 15.0064.) Jack Dixon, a GNC shareholder and partner at KPMG, informed the Committee that his company had some dealings with MidCoast in the past, and a Committee member checked with Dun & Bradstreet and reported that MidCoast was a viable company. (Doc. 97-3 at 27-28; *see also* DTX 15.0064.) On October 20, 2000, the Committee reported to the other shareholders that the MidCoast references were favorable and that GNC would move forward with negotiating a stock purchase agreement with MidCoast. (DTX 15.0064.) On November 3, 6, and 7, 2000, GNC liquidated its publicly traded stock and received a total of $4,955,000. (Doc. 36-1 at ¶ 13.) Ms. Allen represented GNC and its shareholders in connection with the sale to MidCoast. (Testimony of S. Allen.)

Through November 2000, GNC and MidCoast finalized arrangements for the transaction. MidCoast arranged for Battery Street, Inc., a newly formed corporation, to acquire GNC's stock. (Doc. 36-1 at ¶ 14.) Mr. Watkins continued to represent MidCoast, (DTX 24.0693-24.0694; Testimony of T. Watkins), and also represented Battery Street. (Testimony of T. Watkins.) The shareholders, through Ms. Allen, reviewed Battery Street's certificate of incorporation and confirmed that it was an existing company. (Testimony of S. Allen.) The shareholders made no additional inquiries about MidCoast or Battery Street because Battery Street planned to pay cash and because they trusted Mr. Haley's ability to review the arrangement with Battery Street and Mr. Watkin's business reputation. (Testimony of S. Allen, W.K. Fraser, P. Thompson, H.A. Andrew.)

By letter dated November 22, 2000, Ms. Allen informed Mr. Watkins that GNC had an estimated federal tax liability of $1,208,690, of which $30,000 had been paid, from the sale of GNC's publicly traded stock. (Doc. 36-1 at ¶ 15.) Also during this time, several GNC shareholders donated their shares to various foundations. (Testimony of M. Angulo, W. Sanders; Doc. 97-2 at 30-31.) Among these were gifts of three shares to a plaintiff, the Community Foundation of Greater Greensboro, Inc. (DTX 21.0003-21.0009; Testimony of W. Sanders.)

On November 27, 2000, one day before the closing, Southeast Acquisition Partners ("SEAP") offered to lend Battery Street $3,818,000 to purchase GNC, conditioned upon Battery Street's repayment within 24 hours. (*See* Doc. 36-1 at ¶ 17 (referencing Doc. 36-1 at 9-10); *see also* DTX 23.0558-23.0560.) None of the shareholders knew the terms of SEAP's loan offer or of how Battery Street would come up with the money to buy GNC's stock. (Testimony of W.K. Fraser, P. Thompson, H.A. Andrew, J. Aplington.)

On November 28, 2000, the GNC shareholders and Battery Street signed a Stock Purchase Agreement (the "Agreement"),[1] which required the shareholders to sell and

---

[1] The Court finds that PTX 111, excluding the table of contents, is a copy of the Agreement between GNC and Battery Street. The table of contents, according to Ms. Allen's testimony which the Court accepts, was not part of the Agreement executed by the parties. (Testimony of S. Allen.) Similarly, the Court finds that the documents referenced in this "table of contents" were not part of the Agreement executed by the parties. (*See* PTX 111.) While Ms. Allen had seen some of these documents, many she had not. (Testimony of S. Allen.) To the extent documents purporting to be the documents referenced in the "table of contents" can be found in DTX 23 at 23.0359-23.0628, including purported transaction summaries, (DTX 23.0364-23.0365), purported consent documents and agreements between companies named "SCALP" and "Cronulla," (DTX 23.0525-23.0554; 23.0621-23.0622), purported loan documents between

Battery Street to buy all shares of GNC for $3,818,000.  (Doc. 36-1 at ¶ 16.)  At that time, GNC's sole assets were two bank accounts—a Wachovia account and a Paine Webber account—that contained cash in the total amount of $4,932,676.  (Doc. 36-1 at ¶¶ 18, 21.)  The Agreement required Battery Street to cause GNC to pay its state and federal taxes for the tax year ending on April 30, 2001, including GNC's "Specified Tax Liability" and all taxes, penalties, and interest GNC was required to pay after the closing date.  (PTX 111.)  Schedule 3.2(h) of the Agreement outlined GNC's Specified Tax Liability as: "(1) federal taxes on 2000 taxable income of $1,210,811.00, and (2) state and local taxes on 2000 taxable income of $267,790.00."  (PTX 111.)

Ms. Allen made copies of the Agreement and Battery Street's corporate documents available for the shareholders to review at closing.  (Testimony of S. Allen, P. Thompson, H.A. Andrew.)  Mr. Haley reviewed Battery Street's certificate of existence, but no other shareholder asked to review the documents.  (Testimony of S. Allen.)  At closing, each shareholder executed a signature page to the Agreement after "scanning" the document or without reading it.  (Testimony of P. Thompson, H.A. Andrew.)

---

Battery Street and SEAP, (DTX 23.0558-23.0570), purported merger documents and certificates between Battery Street and post-transaction GNC, (DTX 23.0571-23.0574; 23.0595-23.0614), and purported contribution documents relating to SCALP and SEAP, (DTX 23.0626-23.0628), the Court finds them to be hearsay.  According to the testimony of IRS agent Maria Angulo, DTX 23 is comprised of a multitude of documents, all produced by Larry Austin, the post-transaction president of GNC.  (*See* Testimony of M. Angulo.)  However, no witness testified as to how these documents came into existence, whether they are real agreements, or when the documents were signed.  The Court finds that these SCALP/Cronulla/SEAP/Battery Street documents were not part of the closing documents and were not available to the GNC shareholders at the closing, nor were they made available to Ms. Allen.  (*See* Testimony of S. Allen.)  The Court further finds that the purported copy of the Agreement with these documents attached at DTX 23.0359-23.0628 is not a copy of the Agreement between GNC and Battery Street and is inadmissible hearsay.  The Court discusses the admissibility of DTX 23 in full *infra.*

Also on November 28, 2000, Battery Street wired the purchase price of $3,818,000 to Ms. Allen's trust account. (Doc. 36-1 at ¶ 20.) Once Ms. Allen received this money from Battery Street, GNC wired $4,928,752 from its Wachovia account to a new Golden Gate Bank account set up by Battery Street in GNC's name. (Doc. 36-1 at ¶ 21.) GNC also wrote a $3,924 check to Battery Street from its Paine Webber account. (Doc. 36-1 at ¶ 21.) These amounts represented the total assets of GNC. (Doc. 36-1 at ¶ 21.) GNC also transferred all outstanding stock certificates to Battery Street. (Doc. 36-1 at ¶ 21.)

On November 30, 2000, Ms. Allen distributed the sale proceeds to the former shareholders in amounts ranging from $31,775 to $478,500. (*See* Doc. 36-1 at ¶ 22.) After the closing, the GNC shareholders had no contact with MidCoast or Battery Street. (*See* Testimony of W.K. Fraser, P. Thompson, H.A. Andrew.)

GNC filed a tax return for the year 2000 that showed it did not owe any tax. (DTX 17.0011.) On December 28, 2004, the IRS issued a statutory Notice of Deficiency to GNC for the tax year ending April 30, 2001. (Doc. 36-1 at ¶ 23; DTX 17.0004.) The deficiency found GNC liable for $1,286,686 in unpaid taxes and an accuracy-related penalty of $514,573.20. (Doc. 36-1 at ¶ 23; DTX 17.0004.) On September 2, 2005, GNC and the IRS entered into a stipulation providing that GNC owed $1,158,132 in unpaid taxes and a $231,626 penalty. (Doc. 36-1 at ¶ 24; DTX 17.0041-17.0042.) The IRS was unable to collect the tax or the penalty from GNC. (*See* Testimony of M. Thompson, C. Ferebee.)

On or about September 30, 2008, the IRS proposed assessments against the plaintiffs as transferees of GNC.[2]  (Doc. 36-1 at ¶ 25.)  On or about July 29, 2009, the plaintiffs collectively paid the IRS in full for the alleged deficiency ($1,158,132 in unpaid taxes and $231,626 in penalties, for a total of $1,389,758).  (Doc. 36-1 at ¶ 26.)

## OVERVIEW OF ISSUES

Section 6901 of the Internal Revenue Code "authorizes the assessment of liability against both (a) transferees of a taxpayer who owes income tax and (b) transferees of transferees." *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 181 (2nd Cir. 2013) (citing 26 U.S.C. § 6901(a)(1)(A)(i), (c)(2)).  Liability against both "shall . . . be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred."  26 U.S.C. § 6901(a); *see also Comm'r v. Stern*, 357 U.S. 39, 43 (1958) (explaining that § 6901 requires the Government to follow the same procedures in transferee cases and ordinary income tax cases, "that is, notice by the [C]ommissioner to the transferee and opportunity either to pay and sue for refund or else to proceed before the [Tax Court], with review by the [federal district] courts").  Section 6901 provides only a procedural remedy against alleged transferees; "substantive state law controls whether a transferee is liable for a transferor's tax liabilities." *Frank Sawyer Trust of May 1992 v. Comm'r*, 712 F.3d 597, 602-03 (1st Cir. 2013); *accord Starnes v. Comm'r*, 680 F.3d 417, 427 (4th Cir. 2012).

---

[2] The IRS did not propose assessments against all of the former GNC shareholders.  (*See* Testimony of M. Angulo.)  For example, the IRS did not seek to collect from non-plaintiff shareholder Mr. Haley.  (*See* Testimony of M. Angulo.)

The Government may collect a corporation's unpaid taxes from former shareholders as transferees "if an independent basis exists under applicable [s]tate law" for holding the former shareholders liable for the corporation's debts. *See Starnes*, 680 F.3d at 427. The substantive law of North Carolina applies in this case.[3] *See Julia R. Swords Trust v. Comm'r*, 142 T.C. No. 19, at *11 (May 29, 2014) ("The applicable [s]tate law is the law of the [s]tate where the transfer occurred."); *see also Frank Sawyer Trust*, 712 F.3d at 602-03; *Starnes*, 680 F.3d at 427.

The Court assumes without deciding that the plaintiffs have the burden of proof.[4] To carry their burden and show overpayment in the transferee liability context, the plaintiffs must prove two independent things: (1) that they are not "transferees" of GNC within the meaning of Section 6901, a procedural question governed by federal law; and

---

[3] The Government also contends that the plaintiffs are liable for GNC's unpaid taxes under the Federal Debt Collection Procedure Act ("FDCPA"). *See* 28 U.S.C. §§ 3301-08. The Government cited no case that applies FDCPA provisions in the context of a tax assessed under Section 6901. It is undisputed that FDCPA provisions do not apply to proceedings brought in Tax Court, *see* 28 U.S.C. § 3002(2); *e.g.*, *Starnes*, 680 F.3d at 425, 427, and nothing suggests that FDCPA principles would apply where a party challenges a transferee assessment in a refund suit before a district court, particularly where the plain language of the FDCPA suggests otherwise. *See* 28 U.S.C. § 3001(b).

[4] Most transferee liability cases originate in Tax Court, where 26 U.S.C. § 6902(a) places the burden of proof on the Government to show liability. *E.g.*, *Starnes*, 680 F.3d at 425, 427. By contrast, it is well-established that in a general refund suit, the plaintiff-taxpayer bears the burden of proving overpayment. *See* 26 U.S.C. § 7422; *see also Bull v. United States*, 295 U.S. 247, 260 (1935); *Higginbotham v. United States*, 556 F.2d 1173, 1175 (4th Cir. 1977); *Timken Roller Bearing Co. v. United States*, 38 F.R.D. 57, 61-62 (N.D. Ohio 1964); *Wehby v. Patterson*, 6 A.F.T.R.2d 5122 (N.D. Ala. 1960); *Van Benschoten v. United States*, 4 A.F.T.R.2d 5707 (S.D. Cal. 1959). Under North Carolina law, the burden of proof in a fraudulent conveyance case is on the creditor to prove that the transfer was fraudulent. *E.g.*, *N.C. Nat'l Bank v. Johnson Furniture Co. of Mount Airy, Inc.*, 34 N.C. App. 134, 137, 237 S.E.2d 313, 315 (1977). Thus, there is a plausible argument that the Section 6901 framework, which looks to state law to determine substantive liability, alters the general rule as to the burden of proof in refund suits. The Court need not decide the issue.

10

(2) that there is no basis for holding them liable for GNC's unpaid taxes, a substantive question governed by state law. *See Starnes*, 680 F.3d at 429 (holding that the second prong of this analysis is "purely a question of state law, without an antecedent federal-law recasting of the disputed transactions").

At trial, the plaintiffs did not dispute that they are transferees of GNC. At issue, then, is whether the plaintiffs have proven that there is no basis for holding them liable for GNC's unpaid taxes under North Carolina law, specifically the North Carolina Uniform Fraudulent Transfer Act ("NCUFTA").

## FINDINGS, CONCLUSIONS, AND ANALYSIS OF DISPUTED QUESTIONS

### 1. Transferee Liability

#### a. The November 28 Transfers

The November 28 transfers resulted in the sale of GNC to Battery Street and consist of Battery Street's transfer of $3,818,000 to the plaintiffs to buy their GNC shares and, in exchange, GNC's transfer of $4,932,676 from its pre-closing accounts to the new GNC account set up by Battery Street at Golden Gate Bank, which gave Battery Street control over GNC and its assets. The Government contends that these transfers were fraudulent under three NCUFTA provisions: § 39-23.5(a), § 39-23.4(a)(2), and § 39-23.4(a)(1). The Court finds and concludes that the November 28 transfers were not fraudulent under any of these provisions.

Under § 39-23.5(a), a transfer made by GNC would be fraudulent if, *inter alia*, GNC did not receive "a reasonably equivalent value in exchange for the transfer" and GNC "was insolvent at that time or . . . became insolvent as a result of the transfer."

N.C. Gen. Stat. § 39-23.5(a).  As a result of the November 28 transfers, GNC transferred

$4,932,676 from its existing accounts, and $4,932,676 was deposited into the new GNC

account.  A "separate and distinct" $3,818,000 was transferred from Battery Street to the

plaintiffs.  *See Starnes*, 680 F.3d at 432.  Because GNC had the same $4,932,676 before

and after the November 28 transfers, the Court finds and concludes that GNC received a

reasonably equivalent value in exchange for the transfer of its cash from one bank

account to another account.  *See Starnes v. Comm'r*, T.C.M. 2011-63, at *8 (Mar. 15,

2011) (collecting cases that define "reasonably equivalent value" under North Carolina

law), *aff'd*, 680 F.3d 417 (4th Cir. 2012).

Moreover, GNC was not rendered insolvent.  At the time of the November 28

transfers, GNC's only debts were federal and state tax liabilities totaling $1,478,601.

Because the $4,932,676 in GNC's new account on November 28 was sufficient to pay

these liabilities, the Court finds that GNC was not rendered insolvent by the November

28 transfers.  Thus, the November 28 transfers were not fraudulent under § 39-23.5(a).

Section 39-23.4(a)(2) also provides that a transfer made by GNC would be

fraudulent if, *inter alia*, GNC did not receive "a reasonably equivalent value in exchange

for the transfer."  N.C. Gen. Stat. § 39-23.4(a)(2).  As found *supra*, GNC received a

reasonably equivalent value in exchange for the November 28 transfer of its money from

one bank account to another.  Thus, the November 28 transfers were not fraudulent under

§ 39-23.4(a)(2).

Under § 39-23.4(a)(1), a transfer made by GNC is fraudulent if, *inter alia*, GNC

made the transfer "[w]ith [the] intent to hinder, delay, or defraud" the Government.  *Id.*

§ 39-23.4(a)(1). The statute identifies thirteen non-exclusive factors for determining GNC's intent. *See id.* § 39-23.4(b)(1)-(13). Proof of the existence of any of these factors is relevant evidence of GNC's intent "but does not create a presumption that [GNC] made a fraudulent transfer." *Id.* § 39-23.4 cmt. 5; *see also Starnes*, T.C.M. 2011-63, at *11.

While several of these factors exist in this case, others do not. As to the November 28 transfers, GNC did not transfer "substantially all [of its] assets" to another party but rather transferred its assets from one bank account to another, *see* N.C. Gen. Stat. § 39-23.4(b)(5), "[t]he value of the consideration" GNC received "was reasonably equivalent to the value of the asset[s] [it] transferred," *see id.* § 39-23.4(b)(8), and, as discussed *supra*, GNC received a reasonably equivalent value in exchange and was not rendered insolvent. *See id.* § 39-23.4(b)(9), (12).

While the November 28 transfers occurred shortly after GNC incurred a "substantial debt," *see id.* § 39-23.4(b)(10), namely the tax liabilities from the liquidation of its publicly traded stock, the funds in GNC's account after these transfers were sufficient to satisfy these tax liabilities. And, while the plaintiffs were "insiders" of GNC before the sale of GNC's stock to Battery Street, *see id.* §§ 39-23.1(7)(a)(4), 39-23.4(b)(1), the November 28 transfer to the plaintiff-insiders was from Battery Street, not GNC. Further, there is nothing credible to indicate illegitimate tax planning on the part of GNC when it was owned by the plaintiffs. *See id.* § 39-23.4(b)(13). Finally, most of the plaintiffs were only tangentially involved in the details of the sale, and no plaintiff had knowledge of MidCoast or Battery Street's tax strategies. Several of the plaintiffs credibly testified that they were familiar with legitimate business reasons for selling a

company at a premium, and the plaintiffs received favorable business references concerning MidCoast.

After weighing the factors and other evidence, the Court finds that when GNC, then controlled by the plaintiffs and other shareholders, transferred money from its existing accounts to a new GNC account controlled by Battery Street, it did not make a transfer with the intent to hinder, delay, or defraud the Government. Thus, the November 28 transfers were not fraudulent under § 39-23.4(a)(1).

### b. The November 29 – December 1 Transfers

The Government contends that the Court should also consider certain transfers that allegedly occurred from November 29 through December 1, 2000, after the plaintiffs no longer controlled GNC. Specifically, the Government contends that:

- On November 29, GNC transferred $3,846,818 from its new account at Golden Gate Bank to SEAP in repayment of a November 27 loan from SEAP to Battery Street;[5]

---

[5] The evidence the Government offered in support of this contention can be found at Doc. 36-1, DTX 23.0561-23.0570 (Battery Street-SEAP promissory note and security agreement), DTX 23.0013-23.0015 (correspondence between Mr. Austin and Fortrend International employees regarding the GNC-Battery Street-SEAP transactions), DTX 16.0079-16.0081 and DTX 26.0001-26.0003 (SEAP's account records), DTX 16.0082-16.0084 and DTX 26.0004-26.0006 (Battery Street's account records), and DTX 16.0085-16.0089 and DTX 26.0007-26.0011 (GNC's account records). (*See* Testimony of M. Angulo.) While various IRS witnesses testified about what these documents said, none of those witnesses had any personal knowledge beyond the information conveyed in the documents themselves and none had any personal knowledge as to whether the transactions reflected in those documents actually occurred.

- On December 1, GNC transferred a $100,000 fee to Fortrend International, a company that assisted Battery Street with purchasing GNC's stock, and transferred a $460,000 fee to MidCoast;[6] and

- After these three transfers, the balance of GNC's account was $192,758.34, an insufficient amount to satisfy GNC's tax liabilities.[7]

Essentially, the Government contends that these three transfers and the November 28 transfers discussed *supra* should be treated as one "transfer" for NCUFTA purposes. *See Starnes*, 680 F.3d at 432. The effect of considering all of these transfers together is to "collapse" the transfers and treat them as if GNC liquidated all of its assets into cash and made one transfer of that cash to the plaintiff-shareholders. *See Diebold*, 736 F.3d at 187; *see also Starnes*, 680 F.3d at 432; *Cullifer v. Comm'r*, T.C.M. 2014-208, at *23 (Oct. 7, 2014). Under this theory, the plaintiffs would then be liable as transferees of GNC because GNC transferred all of its cash to the plaintiffs, received nothing in return, and went "from being fully able to meet its tax obligations to being entirely unable to do so." *Starnes*, 680 F.3d at 433; *see also Diebold*, 736 F.3d at 186-87.

The Government's theory fails for two reasons. First, this theory depends on findings of fact that the November 29 through December 1 transfers occurred as

---

[6] The evidence the Government offered in support of this contention can be found at DTX 16.0089 and DTX 26.0011 (GNC's account record). (*See* Testimony of M. Angulo.) While various IRS agents testified about what these documents said, none of those witnesses had any personal knowledge beyond the information conveyed in the documents themselves and none had any personal knowledge as to whether the events reflected in those documents actually occurred.

[7] The evidence the Government offered in support of this contention is the same evidence set forth in note 6 *supra*.

described by the Government, and the Court is not satisfied by the preponderance of the evidence that those facts exist. Second, the transfers can be collapsed for NCUFTA purposes only if the plaintiffs had actual or constructive knowledge of Battery Street's post-closing plans, that is, if the plaintiffs "knew or should have known before the deal closed that [Battery Street] would cause [GNC] to fail to pay its . . . taxes." *See Starnes*, 680 F.3d at 433. The Court finds that the plaintiffs had no such actual or constructive knowledge of Battery Street's plans for GNC.

### i. Evidence of the Transfers

As proof that the November 29 through December 1 transfers occurred, the Government proffers several pieces of evidence, as set forth in detail in notes 5-7 *supra*. The parties stipulated to the authenticity of a "Loan Facility Letter" dated November 27, 2000, which indicates that SEAP offered to lend Battery Street $3,818,000 to buy GNC, conditioned upon Battery Street repaying the loan within 24 hours. (*See* Doc. 36-1 at ¶ 17 (referencing Doc. 36-1 at 9-10 (Battery Street and SEAP "Loan Facility Letter")); *see also* DTX 23.0558-23.0560.) The Court will consider the Loan Facility Letter.[8]

The Government also proffers various documents within DTX 16, DTX 23, and DTX 26. These documents fall into two categories: (1) bank records in DTX 16 and 26 that reflect the various alleged transfers of funds between GNC, SEAP, Fortrend, and Battery Street; and (2) documents in DTX 23, including a promissory note and a security agreement, that tend to indicate that SEAP loaned Battery Street the money to buy GNC.

---

[8] In the stipulation and at trial, the plaintiffs objected to the relevance of this document. (*See* Doc. 36-1 at ¶ 17; Testimony of M. Angulo, V. Rex.) The Court overrules that objection.

The plaintiffs contend that these documents contain hearsay within hearsay. At trial, the plaintiffs agreed that the documents were maintained as business records of the Government, but contended they are hearsay to the extent they are offered for the truth of the matter asserted because no custodian or other qualified witness identified the documents as business records of Golden Gate Bank, SEAP, Battery Street, or GNC. (*See, e.g.*, Testimony of V. Rex, M. Angulo, C. Ferebee.)

Business records may be admitted under the hearsay exception in Federal Rule of Evidence 803(6) if a "custodian or another qualified witness" testifies that the record was: (1) made at or near the time by someone with knowledge; (2) kept in the course of a regularly conducted business activity; and (3) made as a regular practice of that business activity. Fed. R. Evid. 803(6). Even then, the evidence may be excluded if the opponent presents circumstances that "indicate a lack of trustworthiness" in the record. *Id.* The person who actually prepared the record need not testify as long as the proponent provides evidence "sufficient to support the trustworthiness of the document, and to prove that it was prepared in the usual course of business." *United States v. Hawkins*, 905 F.2d 1489, 1494 (11th Cir. 1990) (internal citation and quotation marks omitted), *cert. denied*, 498 U.S. 1038 (1991).

Federal Rule of Evidence 805 "requires that hearsay *within* hearsay is admissible only if it also comes within an exception to the hearsay rule." *United States v. Filippi*, 172 F.3d 864 (table), 1999 WL 89297, at *7 (4th Cir. Feb. 23, 1999), *cert. denied*, 528 U.S. 846 (1999); *see also* Fed. R. Evid. 805. "Double hearsay in the context of a business record exists when the record is prepared by an employee with information

17

supplied by another person. Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." *United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006) (internal citation and quotation marks omitted), *cert. denied*, 550 U.S. 927 (2007). It is thus clear that a document written by a third person does not automatically become admissible for the truth of the matter stated in the document merely because the Government obtains the document from the third person and thereafter maintains possession of the document in the regular course of its business.

## 1. DTX 23

DTX 23 was identified at trial by IRS agent Maria Angulo as documents produced by Larry Austin, post-transaction president of GNC, in response to an IRS summons.[9] (Testimony of M. Angulo.) From this exhibit, the Government relies on what appear to be a promissory note and a security agreement between SEAP and Battery Street, (*see* DTX 23.0561-23.0570), and purported correspondence between Fortrend employees and Mr. Austin regarding the GNC-Battery Street-SEAP transactions, (DTX 23.0013-23.0015), to prove that SEAP loaned Battery Street the money to purchase GNC.[10] The plaintiffs objected to the admission of these documents for the truth of the matter asserted. (*See* Testimony of M. Angulo.)

---

[9] The Austin documents in DTX 23 were produced by Randall Dick, Mr. Austin's power of attorney. (*See* Testimony of M. Angulo.)

[10] The Government also relies on the Loan Facility Letter between SEAP and Battery Street found at DTX 23.0558-23.0560. There are no evidentiary issues with these pages of DTX 23 because they are identical to Doc. 36-1 at 9-10, which the Court admitted into evidence.

No representative from SEAP or Battery Street testified at trial, and there was no testimony from any witness with personal knowledge about when the documents at issue were created or signed. While various IRS agents read and drew conclusions from some of these documents, no Government witness did, nor would have been able to, testify to the business-record factors in Rule 803(6)(A)-(C), since no witness was familiar with either of these companies' record-keeping systems.

Even if the promissory note and security agreement, (DTX 23.0561-23.0570), qualify as "commercial paper" under Rule 902(9), the Court is not satisfied that there is substantial evidence from which the Court should infer that the documents are authentic. *See United States v. Carriger*, 592 F.2d 312, 316 (6th Cir. 1979). As the plaintiffs pointed out at trial, the dates in the documents' headings and footers do not match; the headings say the documents were created/executed on November 27, 2000, but the footers show a date of January 18, 2001. (*See* DTX 23.0561-23.0570.) Moreover, the documents were purportedly signed by Mr. Austin, one of several people the Government contends acted fraudulently in this entire scheme, (*see* DTX 23.0561-23.0570; Gov't Closing Argument), and anything that hinges on his credibility is immediately suspect. None of the other documents at issue in DTX 23 appear to qualify for self-authentication under Rule 902. The Court will not consider these documents in DTX 23 for the truth of the matter asserted.

Even if the Court admitted these parts of DTX 23, they are insufficient to create liability. The Government's argument is premised on and requires that the plaintiffs have knowledge of the loan in late November. The mismatched dates in the headings and

footers create significant doubt as to whether a loan even occurred, much less that the plaintiffs were aware of it. A more reasonable interpretation is that SEAP and Battery Street created the documents at a later date as part of an effort to create a paper trail. And there is no evidence the plaintiffs were aware of these transactions.

## 2. DTX 16 and 26

DTX 16 was identified at trial by IRS agent Carolyn Ferebee as a collection of some of the documents the Government received in response to IRS summonses issued to a number of different persons and entities.[11] (Testimony of C. Ferebee.) DTX 26 was identified at trial by IRS agent Victoria Rex as documents received from Golden Gate Bank in response to an IRS summons seeking account records for SEAP, Battery Street, and GNC. (Testimony of V. Rex.)

The pages at issue in DTX 16 and the pages at issue in DTX 26 are identical. The pages at issue in DTX 16 are pages 16.0079-16.0081 (SEAP's account records), 16.0082-16.0084 (Battery Street's account records), and 16.0085-16.0089 (GNC's account records). The pages at issue in DTX 26 are pages 26.0001-26.0003 (SEAP's account records), 26.0004-26.0006 (Battery Street's account records), and 26.0007-26.0011

---

[11] The Government's submission of various unrelated documents received from various sources as one trial exhibit caused substantial confusion at trial. (*See* Testimony of C. Ferebee.) Some pages in DTX 16 are admissible, such as, for example, certain pages identified by Mr. Watkins. (*See, e.g.*, DTX 16.0001-16.0006, 16.0009-16.0013, 16.0063-16.0064, 16.0090-16.0091, 16.0097; Testimony of T. Watkins.) The Court has parsed this exhibit to determine which pages are and are not admissible for the truth of the information documented.

(GNC's account records).[12]  Because these purported bank records in DTX 16 and DTX 26 are duplicative, and because the witness who identified DTX 16 had no personal knowledge about the information in the purported bank records beyond what the records themselves disclose, the Court need not consider these pages from DTX 16.  (*See* Testimony of C. Ferebee.)

At trial, the plaintiffs did not dispute that the documents in DTX 26 were produced by Golden Gate Bank and agreed that the Government thereafter maintained the documents in the course of its regular business.  The plaintiffs contend that DTX 26 is still hearsay to the extent the Government is offering the account records for the truth of what the records say because no witness from the Bank identified the documents as the Bank's business records and because no one associated with the entity that owned the bank accounts at issue identified the documents or testified about the transactions reflected in the documents.  (*See* Testimony of V. Rex (objecting to DTX 26), C. Ferebee (objecting to DTX 16.0079-16.0089).)

A Government witness properly authenticated the Golden Gate Bank records as records the Government obtained and kept in the course of its regular business.  Yet, just as with DTX 23, the issue of what documents the Government maintained as business records is not relevant.  No Bank representative testified; no one testified that the bank records were made at or near the time by someone with knowledge, that the records were kept by the Bank in the course of a regularly conducted business activity, or that the

---

[12] DTX 26.0012-26.0043 appear to be GNC's account records after December of 2000.  The Government did not rely on these pages at trial, and they appear to be irrelevant.

records were made as a regular practice of that business activity.  *See* Fed. R. Evid. 803(6)(A)-(D).  There was no certification from the Bank under Rule 902(11).  Nor did the owner of any of the accounts provide any testimony to identify the documents or the transactions reflected therein.  Thus, the Court finds that the bank records in DTX 26.0001-26.0011 are hearsay and are not admissible to prove that the transactions reflected in these records occurred as the Government describes them.

### ii.  Collapsing the Transfers

Even if the Court considered the loan documents in DTX 23.0561-23.0570 and the bank records in DTX 26.0001-26.0011, there is no evidence that any plaintiff had actual knowledge of Battery Street's post-closing plans.  No plaintiff knew at the time GNC's stock was sold to Battery Street that Battery Street would cause GNC not to pay its taxes.  No plaintiff was privy to Battery Street's financial arrangements, and no plaintiff knew that Battery Street had borrowed money to finance the deal, how Battery Street intended to manage GNC after the sale, or what Battery Street's tax strategies were.

That leaves the question of whether the plaintiffs should have known that Battery Street would cause GNC not to pay its taxes.  Under North Carolina law, evaluating whether the plaintiffs had constructive knowledge is a two-part inquiry:

> First, did the [plaintiffs] have actual knowledge of facts that would have led a reasonable person concerned about [GNC's] solvency to inquire further into [Battery Street's] post-closing plans?  Second, if the [plaintiffs] were thereby on "inquiry notice," whether the inquiry a reasonably diligent, similarly-situated person would have undertaken [would have] revealed [Battery Street's] plan to leave [GNC] unable to pay its [2000] taxes?

*Starnes*, 680 F.3d at 434 (collecting cases that discuss the test for constructive knowledge under North Carolina law).

The Court finds that no plaintiff should have known at the time GNC's stock was sold to Battery Street that Battery Street would cause GNC not to pay its taxes. MidCoast and Battery Street were brought to the plaintiffs by an experienced and reputable attorney, and the plaintiffs were represented by their own attorney, neither of whom questioned the propriety of the transaction. The plaintiffs, through their representatives on the Dissolution Committee, conducted a basic background check into MidCoast's business references, which raised no red flags. The shareholder primarily responsible for managing the deal, non-plaintiff Mr. Haley, was an experienced businessman who had no questions about the propriety of the transaction. The plaintiffs did not have actual knowledge of facts that would have led a reasonable person concerned about GNC's solvency to inquire further into Battery Street's post-closing plans, and thus they were not on inquiry notice.

The Government contends that the mere fact that MidCoast offered to pay a "premium" was enough to put the plaintiffs on inquiry notice that MidCoast would cause GNC not to pay its taxes, since MidCoast offered to pay more for the company than its balance sheet showed that it was worth. The Court is not persuaded. Several plaintiffs credibly testified that they were familiar in their business careers with the purchase of companies for a premium, i.e., at a price above a company's "book value" measured by the difference between its assets and liabilities. The premium at issue here was relatively small, and each plaintiff received only a small increase in proceeds from the sale to

23

Battery Street as opposed to from a liquidation. Many non-plaintiff shareholders were clearly not motivated by receiving this larger amount, as they gave their shares away. And, as noted *supra*, Battery Street came to the plaintiffs by way of a reputable and experienced attorney and with favorable business references for its parent entity from KPMG and Dun & Bradstreet, two national accounting firms.

Even if the plaintiffs were on inquiry notice, there is no evidence that further inquiry would have revealed Battery Street's plan to leave GNC unable to pay its taxes. The Government contends that had the plaintiffs obtained independent tax advice to confirm that there was a legitimate tax strategy available that would allow Battery Street to pay for both GNC's stock and GNC's tax debts, they would have learned that there was no such legitimate tax strategy. Yet, the Government offered no testimony suggesting that a person offering "independent tax advice" to the plaintiffs in 2000 would have advised them that there was no legitimate tax strategy, and IRS Notice 2001-16, which was intended to put taxpayers on notice that transactions with companies like MidCoast and Battery Street were fraudulent, was not issued until 2001, after the plaintiffs' involvement with MidCoast and Battery Street ended. The plaintiffs are not required to offer evidence to disprove speculation.

The Government relies on *Diebold*,[13] but that case has very different facts. In *Diebold*, the shareholders specifically sought out potential buyers "that could help them

_____

[13] *See also Salus Mundi Found. v. Comm'r*, No. 12-72527, ___ F.3d ___, ___ 2014 WL 7240010, at *9 (9th Cir. Dec. 22, 2014) ("The Second Circuit's decision in *Diebold Foundation* addressed the same facts, issues, and applicable law at issue in this appeal. While the question of the shareholders' constructive knowledge is a difficult issue, we conclude that the Second

avoid the[ir] tax liability." *Diebold*, 736 F.3d at 188. Here, the plaintiffs did not seek out

MidCoast with the goal of avoiding GNC's tax liability and instead responded to an offer

brought to them by a reputable attorney. In *Diebold*, the plaintiffs were "extremely

sophisticated actors" who deployed a "stable of tax attorneys" to structure the deal. *Id.*

While the plaintiffs here are sophisticated, the deal was simple, and the plaintiffs had one

attorney. In *Diebold*, the deal involved a "huge amount of money," *see id.*, whereas here

the amount involved, in total and as to each plaintiff, was not huge.[14] Finally, in *Diebold*,

the shareholders and their attorneys had a "sophisticated understanding of the . . . entire

transaction," and they knew that the buyer was a new entity with plans to sell the stock

immediately upon closing and with no "legitimate offsetting losses or deductions to

---

Circuit's decision is not demonstrably erroneous."). In the *Salus Mundi* and *Diebold* line of cases, the Tax Court held that three foundations, the Salus Mundi Foundation, the Diebold Foundation, and the Ceres Foundation were not liable as transferees under Section 6901. *See Salus Mundi Found. v. Comm'r*, T.C.M. 2012-61, *1 & n.1, *14 (Mar. 6, 2012), *vacated sub nom. Diebold*, 736 F.3d 172. Because the Diebold Foundation was organized in Connecticut, *see id.* at *1, the Government appealed to the Second Circuit. *See Diebold*, 736 F.3d at 172. Because the Salus Mundi Foundation was organized in Arizona, *see Salus Mundi*, T.C.M. 2012-61, at *1, the Government appealed to the Ninth Circuit. *See Salus Mundi*, ___ F.3d at ___, 2014 WL 7240010, at *9. The Ceres Foundation was organized in South Carolina, *see Salus Mundi*, T.C.M. 2012-61, at *1, but the Government did not appeal to the Fourth Circuit. *See Salus Mundi*, ___ F.3d at ___, 2014 WL 7240010, at *9.

[14] By comparison, the shareholders in *Diebold* received $309 million in exchange for a corporation with $319 million in assets and approximately $81 million in tax liabilities. *See Diebold*, 736 F.3d at 176, 188. In other words, the shareholders collectively received a premium of $71 million over the amount they would have received if they had liquidated the corporation and paid income taxes. *See id.* at 180. This figure is significantly higher than the approximately $400,000 premium the plaintiffs received in this case, a fact that must be considered in determining whether the plaintiffs knew or should have known that Battery Street would cause GNC to fail to pay its taxes. *See id.* at 188; *see also Cullifer*, T.C.M. 2014-208, at *23 ("In *Diebold Found.*, the cumulative effect of the transactions resulted in the shareholders' receiving nearly 97% of the value of Double D's assets. In such circumstances, collapsing the multiple business deals and recharacterizing sale proceeds as a liquidating distribution fairly reflects the true substance of the transactions.").

cancel out the huge built-in gain it would incur upon the sale" of the corporation's assets. *Id.* at 188-89. Here, the plaintiffs, their attorney, and Battery Street's attorney had no knowledge of Battery Street's financial plans and had no information indicating Battery Street had no legitimate losses to offset GNC's tax liabilities.

In sum, the Court concludes that no plaintiff knew or should have known that Battery Street would cause GNC to fail to pay its taxes. The Court declines to collapse the transfers and finds that, even considering the loan agreements in DTX 23.0561-23.0570 and the bank records in DTX 26.0001-26.0011, the November 29 through December 1 transfers described by the Government provide no basis for holding the plaintiffs liable for GNC's unpaid taxes.

### 2. Transferee of a Transferee Liability

In its trial brief and closing argument, the Government made a complex and unclear argument that the plaintiffs are liable as "transferees of a transferee." (*See* Doc. 74 at 25-27; Gov't Closing Argument.) While the Government never cited *Frank Sawyer Trust*, as best the Court can tell this argument is based on the same theory explained by the First Circuit in that case. *See Frank Sawyer Trust*, 712 F.3d at 606-12 (upholding the Tax Court's finding that a trust was not liable as a "transferee" under the Massachusetts Uniform Fraudulent Transfer Act, but remanding the case for the Tax Court to determine if the trust could be liable as a "transferee of a transferee").

This theory depends on the same November 29 through December 1 transfers set forth *supra*. The evidence to support these factual contentions is largely inadmissible,

and the Court is not satisfied that those transfers took place.  Therefore, the plaintiffs

have proven that they are not liable under this theory.

Moreover, the Court has concerns about whether the Government should even be

allowed to raise this theory.  It was not raised in the Government's Answer, (*see* Doc. 8),

it was not raised when the Government successfully sought several stays while *Starnes*

was pending before the Fourth Circuit, (*see* Docs. 17, 20, 22, 24, 25), and it was not

raised when the plaintiffs moved for summary judgment.  (*See* Docs. 33, 36.)  Indeed, in

one of its motions to stay pending *Starnes*, the Government represented to the Court that

"*Starnes* will likely control the outcome of the present matter and, at a minimum, will

likely narrow the issues for the district court."  (Doc. 20 at 2.)

Instead of narrowing the issues, *Starnes* caused the Government to search for new

theories of liability.  (*See generally* Gov't Closing Argument.)  Just a few weeks before

trial, after *Starnes* was decided against the Government and when it became clear that the

case would not settle, the Government inserted this new transferee of a transferee theory

into the case when it filed its trial brief and proposed findings of fact.  (*See* Doc. 74 at 25-

27; Doc. 75 at 15-18.)

While the Government used words that can be read to raise this theory, those

words did not clearly explain the theory; as the Court noted before trial, it was "difficult

to discern" what transfers were at issue and what proof the Government's transferee of a

transferee theory would entail.  (*See* Doc. 87.)  This remained true even after the

Government filed a supplemental trial brief at the Court's direction, (Doc. 93), and during

trial.  While the Government did better at explaining this theory during closing argument,

and finally cited a case that lays out the transferee of a transferee analysis, (*see* Gov't Closing Argument (citing *Cullifer*, T.C.M. 2014-208, at *23-25)), the Government's explanation was still muddy and obviously came after the close of evidence. The Government never cited *Frank Sawyer Trust* to this Court in connection with its transferee of a transferee theory, even though the First Circuit in that case articulated a clear, step-by-step analysis for determining whether transferee of a transferee liability exists. *See Frank Sawyer Trust*, 712 F.3d at 606-12.

As noted *supra*, the Court has assumed that the plaintiffs have the burden of disproving liability in this case. [15] That does not and cannot mean that the plaintiffs bear the burden of explaining with clarity every conceivable theory of liability and then disproving that theory. Nor does it mean that the Government can wait until the eve of trial to surprise the plaintiffs and the Court with a totally new theory of liability. Even if the evidence was sufficient to support this theory, the Court would be inclined to disregard it because of the lateness and lack of clarity with which it was raised.

## CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiffs have met their burden to prove that there is no basis under North Carolina law for holding them liable as transferees for GNC's unpaid taxes.

---

[15] If the Government has the burden of proof in this case, *see supra* n. 4, the Court finds that the Government has failed to produce convincing evidence that establishes the plaintiffs' liability as transferees of a transferee.

The Court perceives that this opinion resolves all pending motions or renders them moot. The Court also perceives that it has ruled on all evidentiary objections made at trial on which the Court reserved ruling. If any party believes otherwise, it shall consult with opposing counsel and then so advise the Court in a Joint Status Report, filed no later than February 27, 2015, that identifies the remaining motion or issue.

It is **ORDERED** that the plaintiffs are entitled to judgment, which will be entered as time permits.

This the 12th day of February, 2015.

_____
UNITED STATES DISTRICT JUDGE